HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JESSE THOMPSON, et al.,

                Plaintiffs,

        v.

NORTH AMERICAN TERRAZZO, INC.,
et al.,

                Defendants.

CASE NO. C13-1007RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on the parties' cross-motions for summary judgment.  The parties did not request oral argument and the court finds oral argument unnecessary.  For the reasons stated herein, the court GRANTS Defendants' motion for summary judgment in part and DENIES it in part.  Dkt. # 35.  The court DENIES Plaintiffs' summary judgment motion.  Dkt. # 39.  Because this order disposes of all claims against Defendants Randy Rubenstein, Paul Singh, and Joseph Geiger, the court directs the clerk to TERMINATE them as parties.  The clerk shall also TERMINATE Plaintiff Vitaliy Ostapyuk as a party because none of his claims survive summary judgment.  The court declines Defendants' request to impose sanctions via Federal Rule of Civil Procedure 11, although the court warns Plaintiff's counsel in Part III.E that he will face sanctions if he repeats the practices he employed in these motions.

This order concludes with a list of claims remaining for trial.

ORDER – 1

## II.  BACKGROUND

In recounting the parties' evidence, the court is mindful of the familiar summary judgment standard, which requires the court to draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**A.    Evidence that Foreman Shawn Novoa Subjected the Flooring Installers Under His Supervision to Repeated Racial Epithets**

A jury could conclude that Shawn Novoa, a foreman at North American Terrazzo, Inc. ("NAT") since late 2009, treated the workers under his supervision abominably.  Mr. Novoa supervised a crew of NAT employees who installed terrazzo flooring at various sites.  The five Plaintiffs, all of whom were members of Mr. Novoa's crew at various times from 2009 to 2011, testified that he demeaned the employees in his charge with frequent profanity-laden racial tirades.

Plaintiff Jesse Thompson, the only African-American worker on the crew, testified that Mr. Novoa belittled him for being "cool" with the "white mother fuckers" who were his coworkers.  Thompson depo. at 73.  Mr. Novoa called him a "F'ing Uncle Tom" and "whitewash."  *Id.* at 74, 77.  He called Mr. Thompson a "nigger," *id.* at 80, and the evidence suggests he did so frequently.  Once when Mr. Thompson asked him to stop, Mr. Novoa responded, "Yo, you nigger, my mother fucking daughter is black."  *Id.*  Mr. Novoa called Mr. Thompson's Latino co-workers "mother fucking wetbacks," and did so "all the time."  *Id.* at 78.  Once when Mr. Thompson asked him to stop and pointed out that Mr. Novoa was "Hispanic" or "Mexican," Mr. Novoa became "really angry" and said "I ain't no mother fucking Mexican.  I'm Chicano, mother fucker."  *Id.* at 83.  He testified about an occasion when a Latino worker submitted a timesheet for 50 hours of work and Mr. Novoa demanded a new sheet because "this company [doesn't] have the kind of money to pay you mother fuckers that kind of money."  *Id.* at 83.  Mr. Novoa told Mr. Thompson that "[t]hese wetback mother fuckers come to [the] United States and . . .

ORDER – 2

they should be happy that they have a mother F'ing job . . . ." *Id.* at 84. Mr. Thompson left NAT in August 2010.

Plaintiff Julio Romero echoed Mr. Thompson's testimony about Mr. Novoa's conduct toward his Latino subordinates. He testified that Mr. Novoa referred to him and other Latino workers as "spick[s]," "wetback[s]," and "water jumper[s]." Romero depo. at 18. Upon learning that Mr. Romero was born in Mexico, Mr. Novoa called him a "F'ing border jumper" who "get[s] all this money and send[s] it back to Mexico, [to] F up our economy." *Id.* at 59-60. Mr. Romero last worked at NAT in November 2010.

Plaintiff Ernesto Martinez, who is Latino, testified that Mr. Novoa told him that he was "going to fire all the fucking white guys, because they are a bunch of lazy asses, and I want a company that is all Mexican." *Id.* at 42. Then he "changed the tune and he said that he was going to fire all the Mexicans, because they were wetbacks and they were just jumping the border because they wanted to come here and get money for free." *Id.* at 43. When Mr. Martinez asked him why Mr. Novoa would speak like that if he was Mexican, Mr. Novoa responded that he was "not a fucking Mexican," but rather "a Chicano." *Id.* Mr. Martinez also witnessed Mr. Novoa calling Mr. Thompson a "fucking nigger" and an "Uncle Tom." *Id.* at 45. He testified that Mr. Novoa treated Mr. Thompson "as if he were an animal." *Id.* at 56. Mr. Martinez last worked at NAT in April 2011.

Plaintiff Vitaliy Ostapyuk, a Caucasian born in Ukraine, was under Mr. Novoa's supervision only briefly in May 2010. He testified that within the first few days of his employment, Mr. Novoa began calling him a "fucking Russian." Ostapyuk Depo. at 25. He also referred to Mr. Ostapyuk as "white trash." Belzberg Decl. (Dkt. # 36), Ex. F. On the last day of Mr. Ostapyuk's employment, Mr. Novoa used the same slur (and variations including "mother fucking Russian" and "fucking white Russian") while ordering his subordinate to clean his tools. Ostapyuk Depo. at 64. Mr. Ostapyuk refused to clean Mr. Novoa's tools, so Mr. Novoa fired him. *Id.* at 65-66.

ORDER – 3

Plaintiff Justin Taylor, who is Caucasian, testified that Mr. Novoa used "racist terms" toward "every Hispanic guy" who worked on his crews, including Mr. Martinez. Taylor depo. at 26.  Mr. Novoa told him, in reference to one Latino worker, to "[h]ave that spick go get alcohol," presumably for cleaning tools.  *Id.* at 27.  He witnessed him call Mr. Ostapyuk a "fucking Russian," and heard him scream "nigger" at Mr. Thompson twice.  He did not use racist terms to describe Mr. Taylor when speaking to him, but Mr. Taylor's co-workers told him that Mr. Novoa called him "[h]onky, white trash, [and] trailer trash."  *Id.* at 27-28.  Mr. Taylor last worked at NAT in October 2010.

Mr. Novoa submitted a declaration in which he denied ever using racially offensive language at NAT.  Dkt. # 55.  That is one of the many reasons that the court cannot grant Plaintiffs' summary judgment motion.  In considering Defendants' request for summary judgment, however, the court must resolve any evidentiary conflict in favor of Plaintiffs.

## B.  Evidence that Plaintiffs Complained to Mr. Novoa's Superiors, to their Union, and to State and Federal Civil Rights Commissions

At least two Plaintiffs testified that they complained about Mr. Novoa's conduct to Joseph Geiger, who was at all times relevant to this lawsuit NAT's Project Manager and Mr. Novoa's immediate supervisor.  Mr. Romero testified that he complained to Mr. Geiger about the "racial demeaning" in October 2009, not long after Mr. Novoa became a foreman.  Romero depo. at 17, 20.  He also complained to his union representatives.  *Id.* at 20.  The union representatives told him that they had discussed his complaints with Mr. Geiger, NAT Vice-President Paul Singh, and NAT President Randy Rubenstein.  *Id.* at 21.  The union representatives told Mr. Romero that Mr. Novoa's superiors did not "see [Mr. Novoa] as being th[at] type of guy."  *Id.*  After a stint of working away from NAT, Mr. Geiger enticed Mr. Romero to return to work in the fall of 2010 by telling him he would not have to work with Mr. Novoa.  *Id.* at 28-29.  After he returned, he encountered Mr. Novoa while picking up his paycheck, and another string of Mr.

ORDER – 4

Novoa's racial slurs ensued. *Id.* at 31-34. He reported the encounter to Mr. Geiger. *Id.* at 34-35. He quit working at NAT soon thereafter, and told Mr. Geiger that it was because of Mr. Novoa. *Id.* at 35-36.

Mr. Martinez also testified that he complained to Mr. Geiger in the fall of 2009. Martinez depo. at 45-46. He contends that when he returned to NAT in 2011 after a long stint away, Mr. Novoa told him that someone had ordered him to "stay away from people." *Id.* at 57. But he did not stay away from people; he approached Mr. Martinez and asked him to sign a letter declaring that he perceived Mr. Novoa's harassment as "just kidding around . . . ." *Id.* at 48. That creates an inference that Mr. Novoa was preparing to defend himself against racial harassment claims, as well as an inference that his superiors at NAT had approached him about those claims. Mr. Martinez refused to sign the letter. *Id.* at 49. When Mr. Geiger confronted Mr. Martinez with a dispute about his Social Security number, Mr. Martinez left NAT. *Id.* at 49-51. Mr. Martinez testified that he left NAT because of the way Mr. Novoa treated him. As he explained:

> Sometimes I didn't even want to go to work. I had to because, out of necessity, I had to work. But it was not a pleasurable thing to do anymore. Sometimes I couldn't even sleep thinking about what I was going to encounter the next day.

*Id.* at 51.

Mr. Geiger denies that Mr. Romero or Mr. Martinez ever complained to him about Mr. Novoa. Geiger depo. at 34-35. A jury could conclude that he is mistaken.

According to Mr. Geiger, Mr. Thompson complained to him about Mr. Novoa in late July or early August 2010, after a meeting in which he, Mr. Singh, and Mr. Rubenstein discussed with Mr. Thompson an incident in which he accidentally spilled a barrel of water at an NAT flooring project. Geiger depo. at 25. Mr. Novoa had fired Mr. Thompson following that incident. *Id.* at 26-27; Thompson depo. at 23-24, 32. Mr. Thompson was attempting to get his job back. Geiger depo. at 26. He told the men present at the meeting that Mr. Novoa had called him a "nigger," and he may have said

ORDER – 5

more about Mr. Novoa's racially-charged conduct. *Id.* at 29-30. Mr. Geiger investigated Mr. Thompson's claim by interviewing an NAT office worker and two laborers whose names are not in the record. *Id.* at 31-32. All three told Mr. Geiger that they had not heard Mr. Novoa use racially charged language. *Id.* Mr. Geiger did not interview any of the Plaintiffs. He decided, in consultation with Mr. Singh, to give Mr. Thompson his job back. *Id.* at 33; Rubenstein Decl. (Dkt. # 37), Ex. G (Aug. 3, 2010 letter from Mr. Geiger granting Mr. Thompson probationary employment).

Mr. Geiger testified that neither Mr. Ostapyuk nor Mr. Taylor ever complained to him about Mr. Novoa. Geiger depo. at 34-35. Mr. Taylor agrees that he did not complain to Mr. Geiger or his superiors, Taylor depo. at 33-34, but he complained to his union, Taylor Depo. at 29-31. Mr. Geiger admits that he witnessed Mr. Novoa call Mr. Ostapyuk a "fucking Russian." Geiger depo. at 24. Mr. Ostapyuk testified that he complained to his union about Mr. Novoa's slurs. Ostapyuk depo. at 21-23.

There is no evidence, other than Mr. Martinez's testimony that Mr. Novoa told him in 2011 that someone had ordered him to "stay away from people," that NAT took any action to stop Mr. Novoa's conduct. Even when Mr. Geiger witnessed him calling Mr. Ostapyuk a "fucking Russian," he did not order Mr. Novoa to stop. Geiger depo. at 24.

Plaintiffs complained to an agency with authority to consider discrimination charges. Mr. Ostapyuk complained to the Seattle Office for Civil Rights ("SOCR"), Mr. Romero and Mr. Martinez complained to the Washington State Human Rights Commission. Belzberg Decl. (Dkt. # 36), Exs. F, H, I. The Equal Opportunity Employment Commission ("EEOC") eventually considered each Plaintiff's complaint, ruling that there was reason to believe that NAT had discriminated against Mr. Thompson, Mr. Romero, and Mr. Martinez in violation of Title VII of the Civil Rights Act of 1964. Franklin Decl. (Dkt. # 51-1), Exs. A-C. The EEOC issued right-to-sue letters to all five Plaintiffs. *Id.*, Ex. K.

ORDER – 6

1    This suit followed, in which Plaintiffs named as Defendants NAT, Mr. Novoa, Mr.

2  Geiger, Mr. Rubenstein, and Mr. Singh.  Their complaint contains claims invoking Title

3  VII, the Washington Law Against Discrimination ("WLAD"), and the Fair Labor

4  Standards Act ("FLSA").  It also asserts that Defendants are liable for outrage, negligent

5  infliction of emotional distress, negligent supervision, various wrongful discharge torts,

6  and breaches of contract.  Defendants moved for summary judgment on all claims;

7  Plaintiffs moved for summary judgment on most of their claims.

### III.   ANALYSIS

9    On a motion for summary judgment, the court must draw all inferences from the

10  admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred*

11  *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate

12  where there is no genuine issue of material fact and the moving party is entitled to

13  judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show

14  the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

15  323 (1986).  The opposing party must then show a genuine issue of fact for trial.

16  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

17  opposing party must present probative evidence to support its claim or defense.  *Intel*

18  *Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The

19  court defers to neither party in resolving purely legal questions.  *See Bendixen v.*

20  *Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

**A.    Mr. Ostapyuk Did Not Timely Sue; the Remaining Plaintiffs Did Not Timely
Sue As to At Least Some Claims.**

22    Plaintiffs filed their suit on June 11, 2013.  With the exception of Mr. Martinez,

23  whose last stint at NAT ended in April 2011, Plaintiffs stopped working at NAT at

24  various times in 2010.  Defendants argue that various statutes of limitation doom all or

25  part of Plaintiffs' claims.

ORDER – 7

The court concludes that Mr. Ostapyuk has no timely claims as a matter of law. Some of the other four Plaintiffs' claims are untimely as a matter of law, the remainder are either barred in part as a matter of law or at least potentially barred. The court now explains these conclusions.

## 1. Washington Statutes of Limitation

Plaintiffs' Washington-law claims are subject to statutes of limitation of three years or fewer. Their WLAD, negligence, breach of implied contract,[1] and wrongful discharge claims have three-year statutes of limitation. RCW 4.16.080 (limitations period for suits based on implied or unwritten contract and suits for "injury to the person or rights of another" not otherwise specified); *Antonius v. King County*, 103 P.3d 729, 732 (Wash. 2004) (three-year limitations period of RCW 4.16.080(2) applies to WLAD claims); *Barnett v. Sequim Valley Ranch, LLC*, 302 P.3d 500, 505 (Wash. Ct. App. 2013) (three-year limitations period of RCW 4.16.080(2) applies to claim for wrongful discharge in violation of public policy). Either a two-year or three-year limitations period applies to outrage claims. *Doe v. Finch*, 942 P.2d 359, 361 (Wash. 1997) (declining to decide whether two-year or three-year period applies). The court assumes, without deciding, that a three-year limitations period applies to Plaintiffs' outrage claims.

The court will discuss the timeliness of Plaintiffs' WLAD claims when it addresses their Title VII claims.

As to their other Washington-law claims, Plaintiffs can sue only to the extent their claims accrued on or after June 11, 2010, three years before they sued. That wholly bars Mr. Ostapyuk's other Washington-law claims, because he last worked at NAT in May 2010. It restricts the remaining Plaintiffs' other Washington-law claims in that they may not pursue them to the extent they are based on occurrences prior to June 11, 2010.

---

[1] A six-year limitations period applies to suits based on a written contract. RCW 4.16.040(1). Although Plaintiffs' complaint alleges breaches of various union contracts, Plaintiffs offer neither evidence nor argument to support that any claim based upon it. Plaintiffs have abandoned any claim based upon a written contract.

ORDER – 8

2.     **FLSA Statutes of Limitation**

Plaintiffs offer so little evidence to support their FLSA claims that it is probably unnecessary to discuss the applicable statute of limitations. Among other things, FLSA guarantees employees a minimum wage and ensures that they receive additional compensation for overtime work. 29 U.S.C. § 206(a), § 207(a)(1). In response to Defendants' motion for summary judgment, Plaintiffs did not mention the FLSA claims of Mr. Romero, Mr. Taylor, or Mr. Ostapyuk, much less cite evidence supporting their FLSA claims.

Plaintiffs mentioned Mr. Thompson's FLSA claim only by pointing to his testimony that there was a single occasion on which he was shortchanged by $200. Thompson Dep. at 121-22. There is no evidence as to when that shortchanging occurred. Putting that aside, Mr. Thompson's evidence does not establish a FLSA violation because there is no evidence that NAT's withholding of $200 implicated FLSA's minimum wage mandate or its overtime mandate. FLSA is not a general guarantee that an employee will be paid his promised wage.

As to Mr. Martinez, Plaintiffs' sole response to Defendants' summary judgment motion was to point to deposition testimony that is not in the record[2] in which he allegedly testifies that Mr. Novoa denied him bathroom breaks.

Even if the court were to assume that Plaintiffs provided evidence sufficient to carry a FLSA claim to the jury, it could not ignore their failure to provide evidence of a *timely* FLSA violation. FLSA has a two-year limitations period for ordinary violations and a three-year period for willful violations. 29 U.S.C. § 255(a). A FLSA violation is willful where the employer knows its actions violate the law or when it acts in reckless

---

[2] To prove the assertion that "Mr. Novoa would not allow [Mr. Martinez] to take bathroom breaks," Plaintiff's counsel cited page 68 of Mr. Thompson's deposition. Pltfs.' Opp'n (Dkt. # 51) at 9. That page of Mr. Thompson's deposition is not in the record. The same page of Mr. Martinez's deposition is also absent. The court observes that Mr. Martinez testified about occasions (on unspecified dates) on which Mr. Novoa permitted him to claim only 8 hours for a 10-hour workday. Martinez depo. at 58-61. Plaintiff's counsel cited none of that testimony, and did not argue that Mr. Martinez had a triable FLSA claim.

ORDER – 9

disregard of the law.  *Haro v. City of Los Angeles*, 745 F.3d 1249, 1258 (9th Cir. 2014) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  In this case, every Plaintiff stopped working at NAT more than two years before filing suit, thus precluding any FLSA claim based on a non-willful violation.  Mr. Ostapyuk stopped working at NAT more than three years before he sued, barring his FLSA claims entirely.  The remaining four Plaintiffs could avoid the statute of limitations only by providing evidence of a willful violation that occurred on or after June 11, 2010.  No Plaintiff has done so. The court therefore grants summary judgment against Plaintiffs' FLSA claims.

### 3.        Statutes of Limitation for WLAD and Title VII Claims

The court next turns to Plaintiffs' claims that invoke Title VII and the WLAD.

Although their complaint invokes the anti-retaliation provisions of Title VII and the WLAD, 42 U.S.C.§ 2000e, RCW § 49.60.210(1), they did not so much as mention a retaliation claim in their summary judgment motion or in response to Defendants' motion, much less point to evidence to support such a claim.  The court deems any retaliation claim to have been abandoned.

Less clear is whether Plaintiffs intended, in their complaint, to state a claim of religious discrimination on behalf of Mr. Romero.  The Equal Opportunity Employment Commission concluded that there was "reasonable cause" to conclude that he was subject to harassment because of his religious beliefs.  Franklin Decl. (Dkt. # 51-1), Ex. C.  The court does not decide whether Mr. Romero pleaded a religious discrimination claim because no party mentioned it in these summary judgment motions.  The parties must clarify the status of that claim in their joint pretrial order.

What remains of Plaintiffs' WLAD and Title VII claims are the race-discrimination claims that will receive most of the court's attention.  Two species of race-discrimination claims are relevant here.  The first is based on discrete acts of racially discriminatory conduct, where each discrete act is severe enough by itself to alter the terms and conditions of a plaintiff's employment, thus giving rise to an actionable claim.

ORDER – 10

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  The second is based on a hostile work environment, which is the cumulative impact of a series of racially-motivated acts.  *Id.* at 115.  A hostile work environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Id.*

> a.      **Title VII Requires a Timely Administrative Charge.**

The difference between discrete-act and hostile-environment claims is key to unraveling Defendants' statute-of-limitations defense to Plaintiffs' WLAD and Title VII claims.  A Title VII plaintiff suing over a discrete act must file a complaint with the EEOC within 180 days of the act, or within 300 days if the complaint is made to a qualifying state or local agency.  *Morgan*, 536 U.S. at 114; 42 U.S.C. § 2000e-5(e)(1).  A Title VII plaintiff suing over a hostile environment must file an administrative complaint within 180 or 300 days of *any act* that is part of the same hostile environment.  *Morgan*, 536 U.S. at 117.  A court may nonetheless consider the "entire time period of the hostile environment" when determining liability.  *Id.*  In either case, the requirement that a Title VII plaintiff timely file an administrative complaint operates as a statute of limitations.  *Porter v. Cal. Dep't of Corrections*, 383 F.3d 1018, 1031 (9th Cir. 2004); *see also Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 624 (2007) ("[I]f the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court.").

Mr. Ostapyuk cannot bring a Title VII claim because he did not timely file his discrimination charge.  Mr. Ostapyuk last worked at NAT in May 2010.  He filed a charge with the Seattle Office of Civil Rights on May 20, 2011, more than 300 days later.  Although the timely-charge requirement is, like other statutes of limitation, subject to waiver, estoppel, and equitable tolling, *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1008 (9th Cir. 2011), Mr. Ostapyuk neither argues that any of these doctrines apply nor

ORDER – 11

offers any evidence to support their application.[3]  Instead, he attempts to avoid the timely-charge requirement by claiming that Mr. Novoa's discriminatory conduct continued into 2011.  That is irrelevant; Mr. Ostapyuk must point to discriminatory conduct that injured *him* within the 300-day period, and he cannot do so, because he was not working at NAT within that period.  *See Stanley v. Trustees of the Cal. State Univ.*, 433 F.3d 1129, 1137 (9th Cir. 2006) ("[W]e have never held the presence of an individual in a workplace or institution where the plaintiff is not present constitutes a hostile environment.").

Also unavailing is Mr. Ostapyuk's citation of the March 14, 2013 letter that ended the EEOC's investigation of his claim.  That letter gave him 90 days to sue, invoking another of Title VII's statutes of limitation.  42 U.S.C. § 2000e-5(f)(1); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1104 (9th Cir. 2008).  That Mr. Ostapyuk sued within another limitations period does not excuse his failure to satisfy the timely-charge requirement.

The remaining four Plaintiffs have at least potentially complied with the timely-charge requirement.  Mr. Romero and Mr. Martinez filed their respective claims with the Washington State Human Rights Commission on June 20, 2011 and August 23, 2011.  Each of them points to at least one incident of Mr. Novoa's racial abuse within 300 days prior to those dates.  Mr. Romero points to Mr. Novoa's confrontation with him when he picked up his paycheck in either October or November 2010, fewer that 300 days before his June 20, 2011 complaint.  Mr. Martinez points to a confrontation with Mr. Novoa in April 2011, fewer than 300 days before his complaint.  Defendants' summary judgment motion does not raise the Title VII statute of limitations against Mr. Taylor or Mr.

---

[3] Plaintiffs asserted that unspecified state-law claims are subject to tolling during the period that a party pursues an administrative complaint for the same wrongdoing, citing *Salgado v. Atlantic Richfield Co.*, 823 F.2d 1322, 1326 (9th Cir. 1987).  The *Salgado* court considered California law.  The court is aware of no authority that permits a Washington plaintiff to toll any statute of limitations by reason of filing a charge with the EEOC or qualifying local agency.  Certainly Plaintiffs cited no such authority.

ORDER – 12

Thompson.[4]  They can prevail on their Title VII claims at trial by pointing to either a discrete act occurring 300 days prior to their administrative charge or an act within the same period that is part of a hostile work environment.

   b.   **The WLAD Requires a Discrete Act or Act in Furtherance of a Hostile Work Environment Within Three Years Prior to Suit.**

Defendants urge the court not to consider Plaintiffs' WLAD claims because Plaintiffs did not mention the WLAD in opposing summary judgment.  Defendants accurately characterize Plaintiffs' briefing.  The court cannot, however, ignore that the WLAD, at least as applied to race-discrimination claims like the ones Plaintiffs have articulated, closely resembles Title VII.  *See Xieng v. People's Nat'l Bank of Wash.*, 844 P.2d 389, 392 (Wash. 1993) (noting parallels between Title VII and WLAD as to race discrimination); *Robel v. Roundup Corp.*, 59 P.3d 611, 615-16 (Wash. 2002) (noting that WLAD is "analogous to Title VII").  Plaintiffs' WLAD claims rise and fall on the same evidence as their Title VII claims.  The court declines to strip them of the protections of the WLAD simply because their counsel declined to cite the WLAD or cases interpreting it.

A key difference between the WLAD and Title VII is that the WLAD does not require a plaintiff to first exhaust an administrative claim.  Instead, a three-year statute of limitations applies.  *Antonius*, 103 P.3d at 732.  Washington courts have followed their federal counterparts in distinguishing race-discrimination claims based on discrete acts from claims based on a hostile environment.  *Id.* at 736 (following *Morgan*, "permitting suits based on acts that individually may not be actionable but together constitute part of a unified whole comprising a hostile work environment"); *see also Crownover v. Dep't of*

---

[4] In opposition to Plaintiffs' summary judgment motion, Defendants for the first time put Mr. Thompson's October 11, 2012 EEOC charge into the record, and for the first time argued that his Title VII claims were time-barred because that charge came more than two years after Mr. Thompson left NAT.  Defs.' Opp'n (Dkt. # 53) at 11; Belzberg Decl. (Dkt. # 54), Ex. A.  The court has no idea why Defendants did not sooner raise this issue, and has no idea why they did not request summary judgment on that basis.  For that reason, the court will not decide the timeliness of Mr. Thompson's Title VII claim on summary judgment.

ORDER – 13

*Transportation*, 265 P.3d 971, 977-78 (Wash. Ct. App. 2011) (applying *Morgan* and *Antonius*).  As in Title VII cases, a WLAD hostile environment claim is timely if it is based on at least one act within the limitations period that is part of the same hostile environment.  *Antonius*, 103 P.3d at 737.

Mr. Ostapyuk's WLAD claims, like all of his other claims, are untimely.  He last worked at NAT in May 2010; he did not sue until June 2013.  For the remainder of this order, the court uses the term "Plaintiffs" to refer only to the Plaintiffs other than Mr. Ostapyuk.

Plaintiffs can prevail on their WLAD claims at trial by pointing to either a discrete act occurring after June 10, 2010 or an act occurring after the same date that is part of a hostile work environment.  As the court has already explained, both Mr. Martinez and Mr. Romero have pointed to acts within that time period.  As was the case with respect to their Title VII claims, Defendants did not raise the WLAD's statute of limitations as a basis for summary judgment against Mr. Taylor or Mr. Thompson.  *See supra* n.4.

## B.    Plaintiffs' Race-Discrimination Claims May Proceed to the Jury.

To survive summary judgment on a racial hostile work environment claim, a plaintiff must show a genuine factual dispute as to whether she experience harassment so severe and pervasive, in light of all circumstances, that it altered the conditions of the plaintiff's employment.  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).  The plaintiff must show that the environment was subjectively hostile and that it would have been objectively hostile to a reasonable person of the same race.  *Id.* at 1112-13; *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998); *see also Robel*, 59 P.3d at 616 (applying WLAD to claim of disability-motivated hostile work environment).  In addition, the plaintiff must prove that the hostile environment is attributable to the employer, either because a supervisor committed the acts constituting the hostile environment, or because the employer knew or should have known of the hostile

ORDER – 14

environment and did not take adequate corrective measures.  *McGinest*, 360 F.3d at 1119; *Robel*, 59 P.3d at 617.

### 1.      Evidence of Hostile Environment

There is ample evidence from which a jury could conclude that Mr. Novoa created a work environment that was, from the perspective of the Plaintiffs, subjectively and objectively hostile.  Defendants contend that Mr. Novoa's harassment was not severe and pervasive as a matter of law; the court disagrees.  The law requires only that a plaintiff prove that hostile conduct polluted her workplace, made it more difficult to do her job, to take pride in her work, and to desire to stay at her job.  *McGinest*, 360 F.3d at 1113. Plaintiffs have individually and collectively provided evidence that Mr. Novoa's hostile conduct polluted their employment at NAT, made their jobs much more difficult, demeaned them, and made them want to leave NAT.  The record would permit a jury to conclude that each Plaintiff subjectively experienced Mr. Novoa's harassment as hostile; indeed, the court is not aware of evidence to the contrary.  A jury could also conclude that any reasonable person of any race would have found the working environment on Mr. Novoa's crew to be racially hostile.

#### a.      A Jury Must Decide Whether Gaps In Mr. Martinez's and Mr. Romero's Employment Undermine Their Assertion of a Single Hostile Work Environment.

Defendants cannot, at least on summary judgment, dispute the accuracy of Plaintiffs' accounts of Mr. Novoa's pervasive harassment; their insistence that Plaintiffs did not experience severe and pervasive harassment comes instead from parsing the timeframes of their employment and relying on the statute of limitations.  NAT workers often left (or were laid off) at the conclusion of one project, only to return later when a new project began.  Mr. Romero, for example, left work at NAT in approximately November 2009 and did not return until October 2010.  Mr. Martinez left NAT at the end of 2009 and did not return until February 2011.  Defendants contend that because these Plaintiffs were free from Mr. Novoa's insults for just under or over a year, they cannot

ORDER – 15

complain of pervasive harassment.  Defendants are mistaken.  Courts recognize that even long breaks in employment do not prevent treatment of conduct before and after the break as part of the same hostile work environment.  The *Morgan* Court, for example, considered a hypothetical scenario in which acts "contribut[ing] to a hostile environment [occurred] on days 1-100 and on day 401, but [not] between days 100-400."  536 U.S. at 118.  The Court explained that "it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of a whole."  *Id.*  On the other hand, the Court recognized that "if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts . . . ."  *Id.*  The Washington Supreme Court followed the *Morgan* Court's reasoning in *Antonius*, rejecting an employer's argument that an employee's one-year reassignment to a facility where no harassment occurred precludes the conclusion that a hostile environment was pervasive.  103 P.3d at 631, 737-38.  Defendants cite several federal district court cases (and one case from the Third Circuit) in which courts have held that some gaps are too long as a matter of law.  Those cases are distinguishable on their facts.

Both Mr. Romero and Mr. Martinez have pointed to evidence that would permit a jury to conclude that Mr. Novoa's harassment bridged their gaps in employment.  Mr. Romero testified that he returned to NAT in 2010 only because Mr. Geiger agreed that he would not have to work with Mr. Novoa.  Romero depo. at 28-29.  He nonetheless encountered Mr. Novoa in an NAT office while picking up a paycheck, and Mr. Novoa immediately resumed his racial epithets.  *Id.* at 30-35.  Mr. Romero testified that he left NAT for good because he could no longer work at a company where he would encounter Mr. Novoa.  *Id.* at 35-36.  Mr. Martinez returned to NAT in February 2011 when Mr. Novoa was working elsewhere.  Martinez depo. at 47.  Within a few weeks, Mr. Novoa returned and again intimidated him.  *Id.*  By April 2011, Mr. Novoa had confronted him

ORDER – 16

1    and demanded that he sign a document declaring that he perceived Mr. Novoa's conduct

2    as "just kidding around with you guys." *Id.* at 47-48.  Mr. Martinez refused to sign. *Id.*

3    at 48.  Mr. Novoa's harassment was among the reasons that Mr. Martinez left NAT. *Id.*

4    at 50.  As to both Mr. Romero and Mr. Martinez, a jury could conclude that they

5    experienced a hostile environment in earlier stints at NAT and that the hostile

6    environment continued when they resumed working at NAT.  A jury could conclude that

7    the passage of a year (more or less) did not dissipate the impact of Mr. Novoa's racially

8    abusive conduct.

9                    **b.    Even Though Mr. Taylor Did Not Directly Receive Insults From
                              Mr. Novoa, a Jury Must Decide Whether He Experienced a
10                            Racially Hostile Environment.**

11           Defendants also contend that because Mr. Novoa did not directly target Mr. Taylor

12   for harassment, he cannot sue.  The court disagrees for two reasons.  First, a jury could

13   find that Mr. Taylor experienced a hostile environment in part because of what other co-

14   workers told him that Mr. Novoa said about Caucasian people.  No authority requires that

15   a plaintiff receive racial insults directly.  *Monteiro v. Tempe Union High Sch. Dist.*, 158

16   F.3d 1022, 1033-34 (9th Cir. 1998) (concluding in Title VI case, after review of Title VII

17   authority, that "racist attacks need not be directed at the complainant in order to create a

18   hostile educational environment").  There is evidence that Mr. Taylor witnessed or was

19   aware of harassment targeting Mr. Ostapyuk, who was also Caucasian.  Taylor depo. at

20   26-27; *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1123 (9th Cir. 2008)

21   ("[D]iscriminatory conduct directed at an individual other than the plaintiff may be

22   relevant to a hostile work environment claim.").  That, coupled with evidence of Mr.

23   Novoa's targeting of African-American and Latino workers, could permit a jury to

24   conclude that Mr. Novoa targeted Caucasian workers as well.

25           Second, although *Monteiro* and cases like it typically consider a hostile

26   environment claim from a person of the same race (or gender) as the target of the hostile

27

28   ORDER – 17

environment, the court is aware of no binding authority prohibiting a person of one race from suing over an environment hostile to other races.  A Fifth Circuit case illustrates how evidence of pervasive racial harassment can support the hostile environment claim of a plaintiff of a different race.  In *Hernandez v. Yellow Transportation, Inc.*, the court considered whether Latino workers claiming a hostile work environment could point to evidence of hostility directed at African-American workers.  670 F.3d 644, 653-54 (5th Cir. 2012) (declining to reach a "specific holding . . . regarding how evidence of the workplace environment for one category of employees can be used to support the claims under Title VII for another category").  The *Hernandez* court also considered the hostile environment claim of a Caucasian employee who argued that he was harassed because he associated with African-American and Hispanic workers.  *Id.* at 654-55.  The court rejected those plaintiffs' claims because there was insufficient evidence of sufficiently severe and pervasive hostility; it did not foreclose a similarly-situated plaintiff from prevailing.  Another federal appeals court favorably cited a 1970 EEOC ruling that a Caucasian could invoke Title VII to complain of a hostile work environment directed at other races.  *Vinson v. Taylor*, 753 F.2d 141, 146 n.41 (D.C. Cir. 1985) (citing EEOC Dec. No. 71-909, Fair Empl. Prac. Cas. at 269-70).  Although the court is aware of no binding authority on point, the court doubts that Title VII bars the claim of a plaintiff, like Mr. Taylor, who has evidence that his working environment was objectively and subjectively hostile because of pervasive harassment of people of other races.  A jury must decide Mr. Taylor's hostile environment claim.

### 2.    Evidence Imputing Hostile Environment to NAT

In addition to establishing severe and pervasive harassment, a plaintiff must show that her employer can be held responsible for the harassment.  *McGinest*, 360 F.3d at 1119 (requiring court to first assess whether a hostile environment existed, then determine whether employer's "response was adequate as a whole").  An employer is presumptively responsible if supervisors engaged in harassing conduct.  *Id.* (citing

ORDER – 18

1    *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th Cir. 2001), and noting affirmative

2    defense available to employers in such cases).  Where non-supervisor co-workers

3    committed the acts that caused the hostile work environment, the plaintiff must show that

4    the employer knew or should have known about the hostile environment and failed to

5    take adequate remedial and disciplinary action.  *Id.*  The WLAD takes essentially the

6    same approach to imputing liability to an employer.  *Robel*, 59 P.3d at 618.

7           There is evidence from which a jury could conclude that Mr. Novoa himself was a

8    supervisor whose knowledge is imputed to NAT.  For Title VII purposes, a supervisor is

9    a person "with immediate (or successively higher) authority over the employee."

10   *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Davis v. Team Elec. Co.*, 520

11   F.3d 1080, 1096 (9th Cir. 2008) (explaining that a supervisor is a person "with immediate

12   authority over the plaintiff"); *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2454 (2013)

13   ("We hold that an employee is a 'supervisor' for purposes of vicarious liability under

14   Title VII if he or she is empowered by the employer to take tangible employment actions

15   against the victim.").  The WLAD holds an employer liable when "an owner, manager,

16   partner or corporate officer personally participated in the harassment . . . ."  *Robel*, 59

17   P.3d at 617 (quoting *Glasgow v. Georgia-Pacific Corp.*, 693 P.2d 708, 712 (Wash.

18   1985)).  A "manager" for purposes of the WLAD is a person "who ha[s] been given by

19   the employer the authority and power to affect the hours, wages, and working conditions

20   of the employer's workers."  *Robel*, 59 P.3d at 618 n.5.[5]  Mr. Rubenstein declares that

21   Mr. Novoa "did not possess the authority to take tangible employment actions against his

22   co-workers."  Rubenstein Decl. (Dkt. # 37) ¶ 1.  There is evidence that would permit the

23   jury to reject Mr. Rubinstein's declaration, including evidence that Mr. Novoa fired both

24   Mr. Ostapyuk and Mr. Thompson and evidence that he was responsible for deciding how

25   ─────────────────────────
     [5] Defendants prefer that the court rely on an allegedly more restrictive definition of "manager"
26   that appears in *Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1186-88 (Wash. Ct. App.
     2000).  But *Robel* postdates *Francom*, and the court is compelled to resolve questions of state
27   law as the state's highest court would decide them.  *Vestar Development II, LLC v. Gen.
     Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001).

28   ORDER – 19

many hours his employees could work.  That Mr. Novoa's decisions were subject to review by his superiors (as was the case when Mr. Geiger and others decided to reinstate Mr. Thompson) does not mean that he lacked supervisory power.

Even if a jury concluded that Mr. Novoa was not a supervisor or manager, it could conclude that his superiors were aware of his misconduct and failed to correct it.  The court has already recounted the testimony of Plaintiffs who claim to have reported Mr. Novoa's conduct to Mr. Geiger.  Mr. Geiger admits, at a minimum, that Mr. Thompson complained of racial harassment in August 2010.  A jury could conclude that Mr. Geiger's investigation of Mr. Thompson's complaints was inadequate.  A jury could also conclude that Mr. Geiger heard about Mr. Novoa's conduct from many sources other than Mr. Thompson.  Among other things, there is evidence that union representatives relayed Mr. Romero's complaints about Mr. Novoa to Mr. Geiger, Mr. Rubenstein, and Mr. Singh in late 2009.  Mr. Rubenstein and Mr. Singh, for their parts, were at a minimum aware of Mr. Novoa's harassment of Mr. Thompson because of their conversation with Mr. Geiger and Mr. Thompson in August 2010.  A jury could also conclude that Mr. Novoa's harassment was so pervasive that no reasonably diligent person in the shoes of Mr. Rubenstein, Mr. Singh, or Mr. Geiger could have escaped knowledge of it.  A jury could conclude that despite their knowledge, none of Mr. Novoa's supervisors took any action effective to end Mr. Novoa's harassment.  *See Crownover*, 265 P.3d at 979 (noting that corrective action that fails to "end the harassment" is not adequate).

For the same reasons, a jury could conclude that NAT cannot prove a defense that would permit it to avoid the imputation of the hostile work environment based on the conduct of Plaintiffs' superiors.  That "two-pronged affirmative defense," sometimes known as the *Faragher/Ellerth* defense, requires an employer to demonstrate that it took reasonable care to prevent and correct harassment and that the plaintiff failed to take advantage of corrective opportunities.  *McGinest*, 360 F.3d at 1119 & n.12; *Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 955-56 (9th Cir. 1999) (citing *Faragher* and *Burlington*

ORDER – 20

*Indus. v. Ellerth*, 524 U.S. 742 (1998)).  Defendants present evidence of an NAT policy for addressing misconduct like Mr. Novoa's, but the court need not dwell on it.  Even if a jury believes that NAT had an adequate remedial system in place, a jury could believe Plaintiffs' evidence that Mr. Geiger, Mr. Singh, and Mr. Rubenstein did nothing when they learned of Mr. Novoa's conduct.  That would suffice to defeat NAT's assertion of the *Faragher/Ellerth* defense.

The court has already informed Plaintiffs, in granting them leave to file an amended complaint, that Title VII does not permit them to sue individual employees, even supervisors.  May 19, 2014 ord. (Dkt. # 19) at 5-6; *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).  Thus, NAT is the only Defendant who will face their Title VII hostile-environment claims.  The WLAD, on the other hand, imposes liability directly on supervisors who violate the WLAD as well as the entity employing them. *Brown v. Scott Paper Worldwide Co.*, 20 P.3d 921, 928 (Wash. 2001) ("[I]ndividual employers, along with their supervisors, may be held liable for their discriminatory acts.").  A supervisor must "*affirmatively* engage in discriminatory conduct" to be held liable.  *Id.* at 927 n.3 (emphasis in original).  A jury could conclude that Mr. Novoa discriminated against Plaintiffs and hold him personally liable.  Plaintiffs do not, however, offer evidence that Mr. Geiger, Mr. Singh, and Mr. Rubenstein affirmatively discriminated against Plaintiffs.  At most, they failed to act appropriately to remedy Mr. Novoa's discrimination.  Plaintiffs do not attempt to demonstrate that this makes them independently liable, and the court accordingly grants summary judgment as to the WLAD hostile-environment claims against Mr. Geiger, Mr. Singh, and Mr. Rubenstein.

Before concluding its discussion of Plaintiffs' hostile environment claims, the court notes that a jury would be required to take notice of the EEOC's determinations (as to Mr. Martinez, Mr. Romero, and Mr. Thompson) that there was reasonable cause to conclude that NAT was liable for a hostile work environment.  In *Plummer v. W. Int'l Hotels Co.*, 656 F.2d 502, 505 (9th Cir. 1981), the court held that a "plaintiff has a right

ORDER – 21

to introduce an EEOC probable cause determination in a Title VII lawsuit, regardless of what other claims are asserted, or whether the case is tried before a judge or jury." Exclusion of an EEOC or state-agency probable cause determination is reversible error. *Heyne v. Hill*, 69 F.3d 1475, 1483-84 (9th Cir. 1995). An EEOC reasonable-cause determination is not, by itself, sufficient evidence to avoid summary judgment. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1284 (9th Cir. 2000). It is, nonetheless, further evidence supporting the court's conclusion that a jury could rule that NAT is liable for a hostile work environment.

### 3.  Evidence Supporting a Claim Based on Discrete Acts

Plaintiffs made no attempt to identify a discrete act of actionable race discrimination in response to Defendants' summary judgment motion. The court cannot ignore that there is evidence of discrete acts that might support a timely race-discrimination claim by themselves. In addition, the circumstances of Mr. Martinez's and Mr. Romero's departures from NAT are at least arguably fodder for a constructive discharge claim. *See Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (explaining that an employee who resigns can prove constructive discharge only by proving that her working conditions were "so intolerable that a reasonable person in the employee's position would have felt compelled to resign"). As to Mr. Thompson, a jury might question whether NAT laid him off just days after he was fired by Mr. Novoa (then reinstated by his superiors), and might then question whether the "layoff" was pretext for a racially-motivated decision. But there is also evidence that would permit a jury to conclude that all four Plaintiffs left NAT voluntarily. Because Plaintiffs made no effort to support a race discrimination claim based on a discrete act, the court grants summary judgment in Defendants favor as to any discrete-act claim.

### C.  A Jury Must Decide Two Plaintiffs' Emotional Distress Claims.

Plaintiffs contend that Defendants are liable for negligent or intentional infliction of emotional distress. The tort of intentional infliction of emotional distress, also known

ORDER – 22

as the tort of outrage, requires "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff." *Robel*, 59 P.3d at 619.  To satisfy the first element, a plaintiff must prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted).  A court need not permit a jury to resolve an outrage claim if it determines that reasonable minds could not differ on whether the challenged conduct was sufficiently outrageous.  *Id.; Dicomes v. Washington*, 782 P.2d 1002, 1013 (Wash. 1989); *Steinbock v. Ferry County Pub. Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct. App. 2011) (affirming dismissal of outrage claim, recognizing that trial court must serve a "gatekeeping role" in determining what qualifies as outrage).  A claim of negligent infliction of emotional distress requires proof of objective symptoms of emotional distress.  *Hegel v. McMahon*, 136 Wn.2d 122, 960 P.2d 424, 431 (Wash. 1998) (requiring emotional distress "susceptible to medical diagnosis and provable through medical evidence").

Neither Mr. Taylor nor Mr. Martinez offer evidence of their emotional distress. The court therefore grants summary judgment against their emotional distress claims.

Both Mr. Romero and Mr. Thompson offer evidence that they suffered emotional distress and that medical professionals diagnosed them with mental health conditions as a result of Mr. Novoa's treatment of them.  As to the court's gatekeeping role, the court has no difficulty concluding that the evidence of Mr. Novoa's racial insults, viewed in the light most favorable to the Plaintiffs, were sufficiently outrageous, extreme, atrocious, and intolerable to allow a jury to decide Mr. Romero's and Mr. Thompson's outrage claims.

Defendants also invoke Washington authority that limits the tort of negligent infliction of emotional distress in the employment context.  The court queries whether it need discuss this issue, given that it seems exceedingly unlikely that a jury would

ORDER – 23

1    conclude that Mr. Novoa's conduct was negligent, rather than intentional.  Plaintiffs have

2    not articulated a version of the facts in which Mr. Novoa acted negligently.

3          Assuming that Plaintiffs will pursue a negligent infliction of emotional distress

4    claim, the court considers the limits of that claim in the employment context.  In *Snyder*

5    *v. Med. Serv. Corp.*, 35 P.3d 1158, 1164 (Wash. 2001), the court observed that "[o]ther

6    jurisdictions have found [that] the tort of negligent infliction of emotional distress does

7    not exist in the employment context or . . . it is severely limited."  The *Snyder* court ruled

8    that employee discipline and employee responses to "personality dispute[s]" could not

9    give rise to a negligent infliction of emotional distress claim.  *Id.* at 1165.  It did not,

10   however, foreclose a workplace-based emotional distress claim outside the disciplinary

11   context.  *Id.*  The *Snyder* court cited *Chea v. Men's Wearhouse, Inc.*, 932 P.2d 1261, 1265

12   (Wash. Ct. App. 1997), in which the court upheld a jury's negligent infliction of

13   emotional distress verdict based on insults leveled at an employee.[6]  Several decisions of

14   Washington's appellate courts suggest that a negligent infliction of emotional distress

15   claim can be coupled with an employment discrimination claim only when it has a

16   separate factual basis.  *E.g.*, *Haubry v. Snow*, 31 P.3d 1186, 1193 (Wash. Ct. App. 2001);

17   *Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1192 (Wash. Ct. App. 2000).  But

18   this court is bound to follow Washington's Supreme Court, *see supra* n.5, which in

19   *Snyder* took a different view of the limits on negligent infliction of emotional distress in

20   the employment context.  Mr. Romero's and Mr. Thompson's claims are, like the claims

21   the *Snyder* court implicitly approved, based on insults and demeaning conduct, not on

22   employee discipline or personality disputes.  Their negligent infliction of emotional

23   distress claims may proceed to the jury.  The court notes, as it has in past decisions, that

24   proper jury instructions will suffice to ensure that Plaintiffs do not receive a duplicative

25   ─────────────
     [6] Defendants point to *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 972 (9th Cir. 2001),
26   which cited *Robel v. Roundup Corp.*, 10 P.3d 1104, 1113 (Wash. Ct. App. 2000) for the
     proposition that Washington does not recognize a negligent infliction of emotional distress claim
27   "when the only factual basis for emotional distress [is] the discrimination claim."  The *Little*
     panel did not have the benefit of *Snyder*, which was decided a few months later.

28   ORDER – 24

1    damage award for their emotional distress. *See Johnson v. Grady Way Station, LLC*, No.

2    C08-1651RAJ, 2009 U.S. Dist. LEXIS 36076, at *5-6 (W.D. Wash. Apr. 6, 2009);

3    *Trizuto v. Bellevue Police Dep't*, 983 F. Supp. 2d 1277, 1294 (W.D. Wash. 2013).

4         Mr. Romero's and Mr. Thompson's outrage claims may proceed to the jury, even

5    if they share the same factual basis as their race-discrimination claims. In *Robel*, the

6    court reversed the court below, which had thrown out a verdict holding an employer

7    liable for an employee's intentional infliction of emotional distress on the plaintiff based

8    on the same allegations supporting the plaintiff's hostile work environment claim. 59

9    P.3d at 619-621. The court cannot, in light of *Robel*, follow the Washington Court of

10   Appeals decision in *Anaya v. Graham*, 950 P.2d 16, 20 (Wash. Ct. App. 1998),

11   dismissing an outrage claim as duplicative of the plaintiff's discrimination claim.

12   **D.    Plaintiffs Have No Other Claims That Survive Summary Judgment.**

13        The only other claims that Plaintiffs mention in response to Defendants' motion

14   for summary judgment are their claims for negligent supervision and wrongful discharge

15   in violation of an implied employment contract. As to the former claim, it is available

16   only to hold an employer responsible for an employee's acts outside the scope of his

17   employment. *See Traverso v. City of Enumclaw*, No. C11-1313RAJ, 2012 U.S. Dist.

18   LEXIS 98461, at *15 (W.D. Wash. Jul. 16, 2012). Plaintiffs have no evidence that Mr.

19   Novoa acted outside the scope of his employment. As to the latter claim, Plaintiffs have

20   also failed to point to an implied contract, much less an implied contract that a Defendant

21   violated. *See Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984).

22   *Thompson* is also the first Washington precedent to acknowledge the tort of wrongful

23   termination in violation of public policy, *id.*, but Plaintiffs do not so much as mention this

24   tort in the motions before the court.

25   **E.    The Court Cannot Impose Rule 11 Sanctions at This Time.**

26        Defendants' opposition to Plaintiffs' summary judgment motion concludes with a

27   request that the court sanction them for violating Rule 11 of the Federal Rules of Civil

28   ORDER – 25

Procedure.  They base this request on "flagrant inconsistencies" between Plaintiffs'

complaint and their deposition testimony.

The court cannot award Rule 11 sanctions based on Defendants' request.

Defendants did not file their Rule 11 motion separately and did not comply with the

Rule's safe-harbor provision.  Fed. R. Civ. P. 11(c)(2).  Even if Defendants had complied

with Rule 11, the court does not necessarily agree that any inconsistencies between

Plaintiffs' complaint and their deposition testimony warrant sanctions.

The court does find, however, that the conduct of Plaintiffs' counsel both in

opposing Defendants' summary judgment motion and in moving for summary judgment

is beneath the standard this court expects of attorneys practicing before it.  This order

attempts to note the vast swaths of Plaintiffs' claims that their counsel declined to

mention in these motions.  For many of the claims that counsel did mention, he offered

only the most meager support.  He often failed to cite evidence necessary to support his

client's claims, even when that evidence was available within documents that Defendants

submitted in support of their motion.  Counsel appears to have put Defendants and the

court through the expense of challenging many claims that Plaintiffs should have

formally abandoned long ago.  Putting aside counsel's belated and silent abandonment of

many of his clients' claims, the court has yet to mention other deficiencies that made the

court's review of these motions much more difficult.  Counsel frequently made assertions

of fact for which he offered no evidentiary support.  Where he did cite evidence, he too

often failed to point to where it was in the record.  He refused to seriously contend with

the untimeliness of portions of his clients' claims.  He did not mention the WLAD.  All

of these deficiencies would have been frustrating enough were they merely part of

Plaintiffs' opposition to Defendants' summary judgment motion, but counsel relied on a

barely-different version of the same brief to request summary judgment for his clients.

That motion had no hope of success; counsel should not have brought it.

ORDER – 26

The court warns counsel to sharply improve his written advocacy.  The court will consider imposing sanctions if he repeats the practices that made the motions before the court so difficult to parse.  As to Plaintiffs' forthcoming motions in limine and other pretrial submissions, the court will review them carefully, and will (at a minimum) require counsel to correct them if they resemble the briefs counsel submitted in support of these motions.

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motion for summary judgment (Dkt. # 35) in part and DENIES it in part.  The court DENIES Plaintiffs' summary judgment motion.  Dkt. # 39.  This order disposes of all claims against Defendants Randy Rubenstein, Paul Singh, and Joseph Geiger, and the court directs the clerk to TERMINATE them as parties.  This order also disposes of all of Plaintiff Vitaliy Ostapyuk's claims, and the court directs the clerk to TERMINATE him as a party.  The court declines Defendants' request for Rule 11 sanctions.

What remains for trial are the claims of Jesse Thompson, Ernesto Martinez, Julio Romero, and Justin Taylor that they worked in a racially hostile environment as a result of Mr. Novoa's conduct and his superiors' failure to correct that conduct.  That claim is potentially cognizable both via Title VII and the WLAD.  NAT is the sole Defendant who faces Title VII liability, whereas both NAT and Mr. Novoa face liability via the WLAD.  Also remaining for trial are Mr. Romero's and Mr. Thompson's claims for intentional and negligent infliction of emotional distress against Mr. Novoa and NAT.  The court makes no ruling as to whether Mr. Romero has a claim for religious discrimination.

Dated this 4th day of March, 2015.

_Richard A Jones_
_____
The Honorable Richard A. Jones
United States District Court Judge

ORDER – 27